THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN PIERANTONI, Defendant and Appellant.

No. 8918. Argued February 10, 1942.—Decided February 25, 1942.

**14**

R. *Hernández Matos* for appellant. *George A. Malcolm, Attorney General, R. A. Gómez, Prosecuting Attorney,* and *Luis Negrón Fernández, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The appellant was charged with murder and convicted of voluntary manslaughter for the killing of Antonio Albino, Jr. He applied for a new trial which was refused, and the court sentenced him to three years in the penitentiary for the crime of manslaughter and to one month in jail for that of carrying a weapon.

The present appeal is based on two assignments of error. In the first it is urged that the trial court erred in refusing to grant a new trial, and in the second that grave and prejudicial error was committed by the court in convicting the defendant of carrying a weapon. To support the first assignment the appellant reproduces the nineteen grounds originally advanced by him in support of his motion for a new trial. We will discuss and determine them in the same order in which they appear in his brief.

First ground. That the court erred. in permitting the district attorney, when stating his theory of the case, to

refer to other crimes and acts with which the defendant had not been charged and which were committed by other persons, although he had not been charged in the information with having acted in concert with said persons.

The remarks of the district attorney, as the same appear from the record, read as follows:

"The facts occurred in the following manner: The Albino family had lived somewhere in the countryside of Peñuelas . . . for seven or eight years. The father of Antonio Albino, Jr., that is, Antonio Albino, Sr., was an overseer of that property . . . *This defendant, and his brothers, who are also charged with other killings which occurred at the same time,* at the same place where this defendant killed Antonio Albino, Jr., while this defendant was accompanied by some of his brothers named Vicente, Miguel, and Teodoro Pierantoni —which brothers or family claimed to be entitled to the possession of that farm and house—on March 9, 1938, assumed the roles of judges, marshals, and policemen, in order to take at all events, through blood and fire, possession of said house and of said property, and entered upon the premises." (Italics ours.)

The district attorney went on to state that the Pierantoni brothers demanded from Albino, Sr., that he vacate the house as otherwise they would kill him; that Albino tried to persuade them to wait until the owner of the property arrived; that Vicente Antoni answered him by drawing a revolver and firing a shot at him; that the defendant then shot deceased in his own parlor; and that as the sons of Albino fled in terror, the defendant fired at them and hit Antonio Albino, Jr., who died shortly thereafter from wounds received by him.

The defendant's objection was raised immediately after the district attorney had uttered the words which appear italicized in the above-quoted paragraph. The court overruled the objection. It does not appear from the record that the defendant took any exception. The district attorney proceeded with his theory, in the form already shown, without any opposition on the part of the defendant.

The purpose of the opening statements of the prosecution and of the defense is to prepare the jury so that they may be able to understand and duly interpret the evidence subsequently to be submitted to them in support of the theories advanced. In stating their respective theories, both the prosecution and the defense may refer to any fact which, according to the rules of evidence, can and should be considered as a part of the *res gestae,* or to any fact of circumstance which is inseparable from the criminal act charged against the accused. This question is not new in this jurisdiction. In *People* v. *Souffront,* 30 P.R.R. 101, *People* v. *Philip,* 34 P.R.R. 619, and *People* v. *López,* 42 P.R.R. 487, this Supreme Court has held that if several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof of testimony of any one of them can not be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a part of the whole criminal transaction. See Underhill on Criminal Evidence, 4th ed., p. 1107, §561.

The lower court did not err in permitting the district attorney to state his theory in the way he did.

Second ground. That the court undertook the examination of several witnesses for the prosecution.

The appellant calls our attention to pages 103, 170, and 275 of the transcript of the evidence. We have read the contents of page 103 and find that the whole of it relates to the stipulation made between the parties to submit the two cases, that of homicide and that of carrying weapons, on the same evidence. Page 170 only contains a discussion between the court and counsel for the defendant as to whether or not the question regarding the title to the property where the crime was committed could be considered in a criminal proceeding.

The incident referred to on page 275 occurred as follows: The defendant offered in evidence the testimony of Erasmo

Gotay, who testified regarding the investigation made by him on the premises after the crime had been committed. When the witness undertook to testify concerning the statements made to him by the widow of Antonio Albino, the district attorney objected on the ground that such statements were not admissible as part of the *res gestae*, nor were they admissible to impeach the testimony of the witness, as the defendant had not laid down the foundation for such impeachment. It was then that the judge, in order to determine whether the statements were admissible as part of the *res gestae*, put the following questions to the witness:

"Q. Did you see what took place there at the time of the occurrence in this case, what happened there?

"A. No, sir.

"Q. What time did you say you arrived at the *barrio?*

"A. At 9:10 p.m.

"Q. When you arrived there, was there any fight, any quarrel or disturbance?

"A. When I got there I found the corpse of Antonio Albino lying on the floor upstairs, and the family was there.

"Q. But no quarrel, no firing of shots, no dispute?

"A. No."

Thereupon the court sustained the objection of the district attorney.

We think that the court below acted correctly and did not abuse its discretion in asking the questions just transcribed and which were absolutely necessary to enable the judge to properly decide the question involved in the objection raised by the prosecution. See *People* v. *Munera,* 39 P.R.R. 267.

Third and fourth grounds. The lower court erred in excluding the evidence which tended to show the title held by the defendant to the property where the facts occurred.

Pedro Albino, deceased's brother, who described how his father and his brother had been killed, was cross-examined by counsel for the defendant, thus:

"Q. Did you state that Antonio Albino, your father, was the overseer of that property?

"A. Yes sir.

"Q. Who owned the property at that time?

"A. During the time my father was there, it was . . . We still acknowledge that it was owned by Juan Bautista Galarza.

"Q. As the owner of the property?

"A. As the owner of the property, and my father had lived on it for nine years.

"Q. Do you know whether that property belonged to the heirs of Pierantoni?"

Whereupon the district attorney objected, on the ground that the question of title could not be considered. The defendant argued that he was going to show that the property was not owned by Galarza and that, on the contrary, it belonged to the heirs of Pierantoni. The objection of the district attorney was sustained by the court, which said:

"But even if it belonged to the heirs of Pierantoni, they had no right to go upon the property and occupy it without an order from the court. Irrespective of who the owner might be, a property can not be invaded for the purpose of forcibly evicting its occupants."

It does not appear from the record that the defendant took any exception to the ruling of the court, and this would be sufficient for us to dismiss the assignment. We do not think, however, that the lower court erred in excluding the evidence which tended to show that the defendant or his relatives had any title to the property. The evidence showed beyond a reasonable doubt that for eight or nine years prior to his death, Antonio Albino and his family had lived on the farm of which he had been appointed overseer, and that during all that time the Albino family had acknowledged that Galarza was the owner of the immovable. Even conceding that the excluded evidence were sufficient to establish the most perfect title thereto in favor of the heirs of Pierantoni, such title would not have been sufficient to warrant the forcible entry carried out by the defendant and his brothers

on the day in question. Their entry upon the property under the circumstances shown by the evidence was an unjustifiable and violent act which Albino and his relatives had a right to oppose with such force as was reasonably necessary to defend their lives and home.

The language used by the judge when excluding the evidence relative to the ownership title, constitutes a correct statement of the law and could not in the least be prejudicial to the rights of the accused.

 Fifth ground. The fifth assignment is so manifestly frivolous that we ought to dismiss it without further comment. The appellant complains that he was not allowed by the lower court to cross-examine Pedro Albino a second time as to certain alleged specific instructions given to his father by Galarza, the owner of the property. Suffice it to say, in justification of the dismissal of this assignment, that the record shows that the judge asked the witness if he knew whether Galarza had given any instruction to his father, to which the witness replied: "No, sir, because they used to go on tours of the property and we would continue our work independently."

 Sixth and seventh grounds. That the lower court erred in commenting upon the characteristics of a dying declaration, and in admitting that of Antonio Albino, Jr.

It appears from the record that when the district attorney offered in evidence the dying declaration of the victim, the defendant objected to its admission and stated that he objected "not because we think it prejudicial in itself, for the evidence is sufficiently clear as to how the facts occurred, but because as a matter of law it is inadmissible."

The declaration in question was made by Albino in the presence of the district attorney in the hospital on the very day he was wounded, that is, on March 9, 1938. The wounded man died on the 11th of the same month, at 2 p. m., and the post-mortem examination was made that same afternoon. The defendant admitted the authenticity of the declaration

offered in evidence and that the same was a true and faithful statement of the testimony of Albino, but insisted that it was not admissible as a dying declaration.

After hearing the arguments of the parties, the court said:

"The characteristics of a dying declaration, that is, a declaration made *in extremis,* are that the person making it believes at the time of making the same that he is going to die, and it has been stated, even in verse, that on the brink of death not even the most villainous lies. Such is the theory of the declaration. So that here in this declaration, which the court has read, are to be found all the necessary requisites: that the declarant thought that he was *in extremis* .... The court thinks that it is admissible and does admit it because, in its opinion, the declaration meets all the requirements provided by the law and the decisions to make it admissible."

When the court closed its statement of the rule regarding the admission of dying declarations which we find to be in accord with the applicable jurisprudence, the defendant again set up his opposition, thus:

"We move for the reconsideration of that ruling, with our apologies to the learned judge who presides. *There is one requisite which has not been complied with, a necessary requisite, that of contemporaneity.* That is, that a long time elapsed between the infliction of the injuries and the declaration. I mean, that it seems to me that there was an interval of two days. Such declaration must necessarily be made contemporaneously, more or less, at the place of the occurrence." (Italics ours.)

The declaration which was admitted in evidence and was made on March 9, 1938, reads as follows:

"DECLARATION OF ANTONIO ALBINO, JR.— (March 9, 1938).—District Attorney (Rodríguez Serra) Raise your right hand. Do you swear to tell the truth?—A. I do.—Q. What is your name?—A. Antonio Albino.—Q. Where do you live?—A. In the ward (*barrio*) of Peñuelas.—Q. How do you feel?—A. Very badly.—Q. But badly in the sense that you may die from that wound?—A. Yes, I have a pain and I can hardly breathe. Oh my God!—Q. Who wounded you?—A. Juanito Pierantoni.—Q. Whom else did he

wound?—A. My father.—Q. How many shots did he fire at your father?—A. I can not say.—Q. And at you?—A. One.—Q. So that only two persons fired there?—A. Yes, sir, two; of course there were more; I ran.—Q. How many persons did you see firing?—A. Vicente fired when I ran.—Q. At whom did he fire? A. At father. —Q. And you, who fired at you?—A. Juanito.—Q. Did you see what weapons were held by Vicente and Juanito Pierantoni?—A. A revolver.—Q. Did you notice whether it was a pistol?—A. No.—Q. Do you think you are going to die?—A. Oh my God! . . . ."

From the opposition set up by the defendant, *supra,* after he had heard the statement of the rule by the court, it is clearly seen that the objection to the admission of the declaration of Albino was not based on any claim that the latter did not think that he was going to die when he made it, but on the fact that the declaration was made two days after the declarant had sustained the wound from which he died. If the contemporaneousness or nearness in point of time, of the injury with the making of the declaration were, as erroneously claimed by the defendant, an essential requisite for the admissibility of a dying declaration, we would have to hold that such requisite was complied with in the case at bar, for it appears from the evidence that Albino was wounded at about 2 p. m. on the 9th of March, 1938, and he made his declaration that same afternoon. As very properly held by the court below, the time when the declaration was made lacks importance, because it is not the case of a statement offered as a part of the *res gestae.* What really matters is that at the time the wounded man made his declaration he thought he was going to die in consequence of the wound received by him. The answers given by the injured person to the district attorney clearly indicate that at that moment the declarant was under the belief that he was going to die.

The court below did not err in admitting the declaration. Moreover—and in this we concur with the defendant—said declaration could not at all prejudice the defendant, inas-

much as the evidence both for the prosecution and for the defense unquestionably established that the wound from which Albino died had been inflicted by the defendant Juan Pierantoni. See *People* v. *Ortiz,* 42 P.R.R. 130; *People* v. *Mejías,* 47 P.R.R. 266; *People* v. *Quirós,* 48 P.R.R. 939; *Aguilar* v. *People,* 49 P.R.R. 652.

■ Eighth ground. After Alfonso Maldonado, a firearm expert, had testified regarding the application of the paraffin test to the defendant with a positive result of 19 points, to Vicente Pierantoni with a positive result of 24 points, and to the dead bodies of Albino, Sr., and Albino, Jr., with negative results in both cases, the defense put the following question to the witness;

"Is it possible for a person who has fired a firearm to nullify, by means of certain remedies, for example, an acid, etc., the result of a paraffin test?"

The court did not err in sustaining the objection of the district attorney. Not only was the question immaterial, it was not even germane to the questions asked by the district attorney on the direct examination of the expert witness.

■ Ninth, tenth, and eleventh grounds. The 9th, 10th, and 11th assignments are clearly frivolous and must be dismissed without our stopping to reproduce or discuss them.

■ Grounds 12th to 14th. These three assignments relate to the testimony of the defense witness, Erasmo Gotay, an insular policeman.

The first incident complained of by the appellant is the same one which we have discussed and determined when considering the second assignment.

The second incident occurred as follows: On the judge holding that the statements made by the widow of Albino to the policemen at 10 p. m., that is, nine hours after the occurrence and when everything was quiet, were not admissible as part of the *res gestae,* the witness, on his own initia-

tive, interrupted the court and said: "She told me . . . ."
It was then that the judge said to the witness:

"Do not say anything; nobody has asked you. You seem to be interested in testifying in a certain way. The court is ruling upon a question raised. You keep silent. Only counsel can argue or talk about it. A witness keeps silent until he is asked."

Let us consider the third incident. After policeman Gotay had testified that when making his investigation he seized five machetes which were found wrapped in a sack on the ceiling of the house, the defendant asked him: "Did you seize five machetes?", and the witness answered: "Five machetes, two of which were bloodstained." The district attorney objected on the ground that the answer was officious, inasmuch as nobody had asked the witness whether or not the machetes were bloodstained, and moved to strike it out because, as the witness was not a chemist, he was not qualified to testify whether the stains were bloodstains. While the court was repeating to the defense the answer given by the witness to its question, the witness again interrupeted the judge, saying: "Will the court allow me"? Then the following colloquy, which we copy from the transcript of the evidence, took place:

"Judge: Wait a moment. You are not an attorney.

"Witness: But in defense of my reputation.

"Judge: I will not hear anything about reputation. Here you are a witness and you can neither argue with the court nor with counsel. Just wait, but if you refuse to keep silent I will compel you to be silent. Or do you mean to impose your will upon the court? I want you to answer that question.

"Witness: I do not mean to control the court. I want, as a police officer, to clear up the truth.

"Judge: Do not forget that you are in the District Court of Ponce, that you are not in the ward (barrio), and that here you are a witness; for it very often happens that people think because they hold some authority in a barrio they can also exercise it in a district court. I am the only authority at present here, the judge who represents the law. You are wearing a policeman's uniform, but it

is your duty to observe the rules of the court like any other witness, otherwise you make yourself liable to the same punishment as any other witness who fails to obey the rules of the court. So that, if your authority has gone to your head, you had better control yourself until you have gone out of the court room. Do you understand it well?

"Witness: Yes, sir.

"Judge: So, please consider yourself as being just like any other witness who takes the stand. When you are testifying you may explain what you have just stated; but do not take part in the argument. Do you understand it well?

"Witness: Yes, sir."

The language used by the court in addressing the witness was indeed harsh and severe. However, in order to be able to determine whether the court was justified in expressing itself as it did, it would be necessary to have observed the attitude and the demeanor of the witness when addressing the court. In the absence of such elements of proof, we are not in a position to decide whether or not the court was justified in talking to the witness as it did.

The statements made by the court to the witness had nothing to do with the latter's credibility and the defendant could not have been prejudiced thereby. Besides, it appears from the record that, notwithstanding all such instances, the court refused to strike out the answer of the witness and allow him to testify at length regarding the bloodstains which, according to him, were seen on two of the machetes seized by him.

Fifteenth ground. The appellant complains of several incidents, all of which are immaterial and which occurred while policeman Gotay was testifying. In all of them the court sustained the objections raised by the defense. The accused suffered no prejudice.

Sixteenth ground. That the court erred in permitting one of the jurors to comment on the evidence before the case had been finally submitted.

This is what happened: During the examination of policeman Gotay, counsel for the defendant asked the court to direct that the police blotter of the station at Peñuelas be produced in court and introduced in evidence in order to dispel any doubt and to corroborate the testimony of the witness in question. The court stated that it did not think the production of the blotter was necessary, inasmuch as the witness had already testified, without objection from the prosecution, in regard to its contents. Then one of the jurors intervened and said:

"In connection with that, I have in mind making a similar request, since the Justice of the Peace stated that he had ordered the family of the deceased to bring the machetes to him as one of the authorities, and then another official who was there stated something that was conflicting: that he had personally brought the machetes and made an entry of the fact on the blotter. Therefore, by looking at the book it might be determined which of the two was right."

The court sustained the motion of the defendant, saying:

"Then, at the request of the juror and of the defendant, and with the consent of the district attorney, the court orders the production of the blotter of the police station at Peñuelas, showing the entries on and after March 9, 1938."

The objection raised by the appellant is groundless. His attorney called for the book so as to dispel any doubt and in order that the entry thereon should serve to corroborate the testimony of his witness policeman Gotay. The juror indorsed his request so as to adjust the conflict between the testimony of Gotay and that of the justice of the peace as to the discovery of the machetes. The intervention of the juror, far from prejudicing the defendant, was rather beneficial to him, as without it the court would certainly not have admitted the book in question.

██ The judgment convicting the defendant of the offense of carrying a weapon is justified by the evidence, which showed that on the day of the occurrence the defendant and

his brothers went from Ponce to the farm in Peñuelas where the deceased had resided with his family for some eight years. After the argument between Albino and the Pierantoni brothers had started, two of the latter, Vicente and Juan, drew the revolvers they were carrying and fired at the two persons who were killed. The mere fact that the Pierantoni brothers thought they held some title to the farm, which they had not occupied for the preceding eight years, did not justify their carrying weapons from Ponce to the place of the occurrence in Peñuelas.

The evidence adduced by the district attorney shows beyond a reasonable doubt the commission of the crime of murder. If such had been the verdict of the jury and the judgment of the court, we would not have hesitated at all to uphold the same.

The judgments appealed from must be affirmed.